1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA


TERRY WRIGHT,

          Plaintiff,                    No.  C 07-4220  WDB

     v.                            **ORDER**

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL
SECURITY,

          Defendant.
_____/


<u>INTRODUCTION</u>

      On February 21, 2008, Plaintiff Terry Wright moved for summary judgment, seeking judicial review of a "partially favorable" (Tr. at 12) final decision by the Commissioner of Social Security finding that Mr. Wright was disabled as of September 19, 2006 — as opposed to January 12, 2005, the date Mr. Wright filed his application seeking benefits —and awarding Mr. Wright Supplemental Security Income ("SSI") benefits as of September 19, 2006.  Defendant, the Commissioner of Social Security, opposed Plaintiff's motion and filed a cross-motion for summary judgment on March 24, 2008, asking the Court to affirm the Commissioner's final decision.  Plaintiff did not file a Reply brief.  The matter then was deemed submitted for decision by this court without oral argument, pursuant to Civil Local Rule 16-5.  After careful review and consideration of the record and the papers submitted, the court hereby DENIES defendant's cross-motion for summary judgment and GRANTS,

1  in part, Plaintiff's request for relief by VACATING the Commissioner's decision and

2  REMANDING the action to the Commissioner for further administrative proceedings

3  consistent with this Order.[1]

4  PROCEDURAL BACKGROUND

5  Plaintiff applied for SSI benefits on January 12, 2005, alleging that he was disabled as

6  of April 5, 2004, due to paranoid schizophrenia, leg pain, and hepatitis C. Plaintiff's request

7  for benefits was denied initially and on reconsideration. Plaintiff then requested and received

8  a hearing before an Administrative Law Judge ("ALJ"). On December 4, 2006, the hearing

9  was held before the Honorable Benjamin F. Parks. Mr. Wright testified at the hearing. He

10 was accompanied by legal counsel, Nancy McCombs. A vocational expert ("VE"), Joel

11 Greenberg, also testified. Dr. David J. Anderson appeared by telephone to testify as a

12 psychiatric medical expert, and to pose questions to Mr. Wright about his illnesses. After the

13 hearing, Judge Parks issued a written decision, finding that Plaintiff was disabled and eligible

14 to receive benefits as of September 19, 2006, but not for any period before that date.

15 Plaintiff then appealed to the Social Security Administration's Appeals Council,

16 asserting that the ALJ's decision with regard to the onset date of September 19, 2006 (as

17 opposed to January 12, 2005, the date Plaintiff filed his application for benefits) was not

18 supported by substantial evidence, and that the ALJ's adverse credibility finding against

19 Plaintiff was not based on the requirements of the Social Security regulations. On June 13,

20 2007, the Appeals Council determined that there was no basis for review, and Judge Parks's

21 decision became the final decision of the Commissioner of Social Security in Plaintiff's case.

22 On August 17, 2007, Plaintiff filed a complaint in federal court seeking review of the

23

24

25 [1] The vocabulary through which we articulate our reasoning about the issues we address in this opinion is largely the product of legal constraint – but we hope the ALJ whose findings are the subject

26 of this proceeding understands that we recognize how difficult his job is and what a huge volume of work he and his colleagues confront. We intend our opinion to serve as one component in a larger,

27 multi-layered process whose design acknowledges limitations under which each level of the system of civil justice must work – a larger process that is designed to improve the likelihood that, in the end, the

28 system will yield outcomes that conform to Congress' mandates.

2

1   decision.  Both parties subsequently consented in writing to proceed before a United States
2   Magistrate Judge.

3

4                               STANDARD OF REVIEW

5          The district court may set aside the Commissioner's denial of disability insurance
6   benefits only when the ALJ's determinations are based on legal error or are not supported by
7   substantial evidence in the record as a whole.  42 U.S.C. § 405(g); *Tackett v. Apfel*, 180 F.3d
8   1094, 1097-98 (9th Cir. 1999) (citations omitted).  "Substantial evidence" means more than
9   a scintilla but less than a preponderance; it is such evidence that a reasonable mind might
10  accept as adequate to support a conclusion.  *Richardson v. Perales*, 402 U.S. 389 (1971);
11  *Meanel v. Apfel*, 172 F.3d 1111, 1113 (9th Cir. 1999).  "If the evidence can support either
12  outcome, the court may not substitute its judgment for that of the ALJ."  *Tackett*, 180 F.3d at
13  1098, quoting *Matney v. Sullivan*, 981 F.2d 1016, 1018 (9th Cir. 1992).

14

15                                 DISCUSSION
16  A.  APPLICABLE LAW - STEPS TO DETERMINING DISABILITY

17         An SSI claimant is considered disabled if (1) she suffers from a "medically
18  determinable physical or mental impairment which can be expected to result in death or which
19  has lasted or can be expected to last for a continuous period of not less than twelve months,"
20  and (2) the "impairment or impairments are of such severity that she is not only unable to do
21  her previous work but cannot, considering her age, education, and work experience, engage
22  in any other kind of substantial gainful work which exists in the national economy."  42
23  U.S.C. § 1382c(a)(3)(A), (B).

24         The Social Security Regulations set out a five-step sequential process for determining
25  whether a claimant is disabled within the meaning of the Social Security Act.  20 C.F.R. §
26  404.1520.  The five steps are:

27         **Step 1.** Is the claimant presently working in a substantially gainful activity? If
           so, then the claimant is "not disabled" within the meaning of the Social Security
28         Act and is not entitled to disability insurance benefits. If the claimant is not

                                        3

working in a substantially gainful activity, then the claimant's case cannot be resolved at step one and the evaluation proceeds to step two. See 20 C.F.R. § 404.1520(b).

**Step 2.** Is the claimant's impairment severe? If not, then the claimant is "not disabled" and is not entitled to disability insurance benefits. If the claimant's impairment is severe, then the claimant's case cannot be resolved at step two and the evaluation proceeds to step three. See 20 C.F.R. § 404.1520(c).

**Step 3**. Does the impairment "meet or equal" one of a list of specific impairments described in the regulations? If so, the claimant is "disabled " and therefore entitled to disability insurance benefits. If the claimant's impairment neither meets nor equals one of the impairments listed in the regulations, then the claimant's case cannot be resolved at step three and the evaluation proceeds to step four. See 20 C.F.R. § 404.1520(d).

**Step 4.** Is the claimant able to do any work that he or she has done in the past? If so, then the claimant is "not disabled" and is not entitled to disability insurance benefits. If the claimant cannot do any work he or she did in the past, then the claimant's case cannot be resolved at step four and the evaluation proceeds to the fifth and final step. See 20 C.F.R. § 404.1520(e).

**Step 5.** Is the claimant able to do any other work? If not, then the claimant is "disabled " and therefore entitled to disability insurance benefits. See 20 C.F.R. § 404.1520(f)(1). If the claimant is able to do other work, then the Commissioner must establish that there are a significant number of jobs in the national economy that claimant can do. There are two ways for the Commissioner to meet the burden of showing that there is other work in "significant numbers" in the national economy that claimant can do: (1) by the testimony of a vocational expert, or (2) by reference to the Medical-Vocational Guidelines at 20 C.F.R. pt. 404, subpt. P, app. 2. If the Commissioner meets this burden, the claimant is "not disabled" and therefore not entitled to disability insurance benefits. See 20 C.F.R. §§ 404.1520(f), 404.1562. If the Commissioner cannot meet this burden, then the claimant is "disabled " and therefore entitled to disability benefits.

*Tackett*, 180 F.3d at 1098-99. The burden of proof is on the claimant as to steps one to four.

*Id.* at 1098. At step five, the burden shifts to the Commissioner. *Id.*

B.    THE ALJ'S DECISION -- APPLICATION OF THE FIVE-STEP PROCESS

Applying the five-step evaluative process, the AJL first found that Plaintiff had not performed substantial gainful activity since April 5, 2004, the date Plaintiff alleges that his disability began. Next, the Judge found that Plaintiff had severe impairments of "social phobia, personality disorder, [and] hepatitis C." (Tr. at 18 and 21). Under step three, the ALJ found that Plaintiff's symptoms did not approach in severity the criteria listed in 20 CFR Part 404, Subpart P, Regulations No. 4. Given that determination, the ALJ was required to proceed to step four, where he determined Plaintiff's "residual functional capacity," or "RFC."

4

1    Under Step four, the ALJ found that from April 5, 2004 to September 19, 2006,
2    Plaintiff retained the RFC to perform a full range of work and had only mild restrictions in
3    the activities of daily living, moderate restriction in social functioning, and mild restriction
4    in sustained concentration, persistence and pace.  Beginning in September 19, 2006, however,
5    during the time Plaintiff was homeless and living underneath a bridge, the Judge concluded
6    that Plaintiff's RFC had diminished.  Dr. Anderson, the medical expert, testified that during
7    this period Plaintiff "would have problems with ongoing ability to sustain an    [sic]
8    employment, and that his personality disorder would make him unable to sustain himself
9    without support and housing."  (Tr. at 20).

10    In his RFC assessment for the period beginning September 19, 2006, the Judge also
11    noted Dr. Anderson's testimony that Plaintiff had <u>moderate</u> limitations in the ability to carry
12    out detailed instructions and the ability to maintain attention and concentration for extended
13    periods, as indicated on the Mental RFC Assessment form completed on June 6, 2005, by Dr.
14    Ida Hilliard.  (Tr. at 20, 113).  The Judge did not explain why this report was used to support
15    a finding of a more limited RFC as of September 2006, 15 months after the form was
16    completed.

17    The ALJ then concluded that Plaintiff had no past relevant work.  Accordingly, the
18    ALJ was required to proceed to step five, where he assessed whether the Social Security
19    Administration met its burden to show that, given his medically determinable impairments,
20    functional limitations, age, education and work experience,  Plaintiff was able to do *other*
21    kinds of work for which significant numbers of jobs existed in the national economy.
22    Crediting the testimony of Joel Greenberg, the vocational expert — based upon a hypothetical
23    posed to the expert about Plaintiff's RFC — the ALJ found that for the period between April
24    5, 2004, and September 19, 2006, Plaintiff was able to perform jobs existing in significant
25    numbers in the regional and national economy, including, for example, working as a janitor
26    or a landscape laborer.  Accordingly, the ALJ concluded that during that time Plaintiff was
27    <u>not</u> disabled within the meaning of the Social Security Act and, thus, that Plaintiff should not
28    receive SSI benefits prior to September 19, 2006.

1   With respect to the period beginning on September 19, 2006, Judge Parks again
2   credited the testimony of the vocational expert based upon a *new* hypothetical posed to the
3   expert with a more limited RFC that, in Judge Parks's opinion, would take into account
4   Plaintiff's diminished abilities after becoming homeless.[2]   The Judge found that as of this time
5   there were no jobs that Plaintiff could perform and, thus, that Plaintiff was disabled and
6   entitled to benefits as of September 19, 2006. (Tr. at 20).

7   We describe the principal evidence relied upon by Judge Parks in the paragraphs that
8   follow.

9   The medical records on which Judge Parks relied included documents from the
10  Richmond Help Center, dated December 1, 2004, regarding Plaintiff's problems with his
11  sinuses. In these records, Plaintiff reported that he had hepatitis C and had been in jail for 29
12  years. He was 46 years old at this time.

13  Judge Parks also relied on records from January 13, 2005 (the day after Plaintiff
14  applied for benefits), from the South of Market Help Center in San Francisco, where Plaintiff
15  complained that his leg would become swollen after he stood up for more than one hour.
16  These records, though quite difficult to read, mention hepatitis C and paranoia. The records
17  also note that there did not seem to be a reason that Plaintiff would be deemed disabled, and
18  the Help Center personnel would not fill out forms related to Plaintiff's disability claim. (Tr.
19  at 102).

20  Judge Parks considered, but ultimately gave little weight to, records and progress notes
21  from an ongoing course of psychiatric treatment with Doctor Norman Stone, Ph.D., and from
22  a Dr. Maloof, M.D., at Bay View Hunters Point Mental Health Services, beginning on
23  February 9, 2005, less than one month after Plaintiff applied for benefits. Dr. Stone's progress
24  notes about Plaintiff continue until October 24, 2006. In his initial assessment, Dr. Stone
25  diagnosed Plaintiff with paranoid schizophrenia and anti-social personality disorder. Dr.

26

27      [2]  Judge Parks did not explain how he chose September 19, 2006, as the relevant date to apply
28  a more limited RFC to account for Plaintiff's homelessness. The record indicates that Plaintiff first
    became homeless in **June 2006**, not September 2006 (*see* Tr. at 180, 196, 207 and 234).

1   Stone wrote that Plaintiff had flat affect and paranoid ideation. Dr. Stone also wrote that
2   Plaintiff had been incarcerated from 1980 to 2000, and had been free for only a few weeks
3   during that period. Plaintiff told Dr. Stone that while he was in prison Plaintiff had witnessed
4   many traumatic events and had seen killings that Plaintiff believed were allowed by the prison
5   authorities. Dr. Stone further noted in his initial assessment that Plaintiff had been drug free
6   since his release from prison in 2000. For treatment, Dr. Stone recommended that Plaintiff
7   be seen for a medical evaluation by Dr. Maloof, a psychiatrist, and that Plaintiff come to see
8   Dr. Stone for "individual narrative therapy." (Tr. at 160).

9         Plaintiff followed the treatment recommendation and began to see Dr. Stone for
10  therapy, during which Dr. Stone recorded his impressions in progress notes. Plaintiff also saw
11  Dr. Maloof, who diagnosed Plaintiff with paranoid schizophrenia and prescribed Geodon, an
12  anti-psychotic medication that helped reduce Plaintiff's hallucinations and paranoid ideation.

13        Dr. Stone's progress notes, spanning over a year and a half, include a lot of information
14  about Plaintiff and the treatment. Judge Parks specifically relied upon the parts of Dr. Stone's
15  notes that indicated that Plaintiff was "doing OK," that Plaintiff was hopeful about his future,
16  Plaintiff had "never done this well," and that Plaintiff was visiting with his sister and was
17  watching television. (Tr. at 17). Judge Parks also mentioned in his opinion that Dr. Stone
18  said that Plaintiff showed no evidence of hallucinations. Judge Parks did not, however, set
19  forth in his opinion the date of the progress notes that included this favorable information
20  about Plaintiff's condition. Indeed, in reviewing the notes, which are voluminous and often
21  difficult to read, it is clear that at the very beginning of treatment the progress notes were not
22  as positive about Plaintiff's condition.

23        In a February 9, 2005, progress note, for example, Dr. Stone wrote that Plaintiff's
24  paranoia began around age 20, that he has auditory and visual hallucinations, and that he
25  doesn't like to be around people. (Tr. at 156). In a note dated February 16, 2005, Dr. Stone
26  wrote that Plaintiff reported that he is paranoid every day he leaves the house, that he checks
27  underneath his bed for intruders, that he checks in the closet 3 to 4 times each night. Plaintiff
28  also told Dr. Stone that his crowd phobia began around 1983 in prison. Subsequently, in a

1  note dated February 23, 2005, Dr. Stone changed his diagnosis of Plaintiff from paranoid

2  schizophrenia to obsessive -compulsive disorder, and specific phobia.  *See* American

3  Psychiatric Association Diagnostic and Statistical Manual of Mental Disorders 4th Ed.,

4  Sections 300.3 and 300.29 (2000).

5      Plaintiff's condition apparently improved after he began taking the Geodon (anti-

6  psychotic medication) prescribed by his psychiatrist, Dr. Maloof.  By February 23, 2005,

7  Plaintiff was reporting that since he began taking his medication that he had not had to check

8  under his bed, and that he felt strange but "good" when he woke up.  He stated further that he

9  would like to be able to be around other people and to have friends, that he was looking

10  forward to a happier life, that he had been to church and had met a few people with whom he

11  felt comfortable.  (Tr. at 149).  In his March 16, 2005, progress note, Dr. Stone wrote that

12  Plaintiff was taking his anti-psychotic medication three times a day, that Plaintiff did not have

13  the problems that he used to have, and that when he asked Plaintiff what he saw in his future,

14  Plaintiff reported that "I see living a normal life, getting along with people, getting out." (Tr.

15  at 148).   In this same note, Dr. Stone wrote that Plaintiff was "neatly dressed and appears to

16  be in remission."  (Tr. at 145).

17      In this same progress note (March 16, 2005), Dr. Stone also indicated that Plaintiff's

18  treatment had been successful and that they would move to appointments for maintenance on

19  a monthly basis.  Plaintiff's success continued through April 2005.  In a note dated April 5,

20  2005, Dr. Stone reported that Plaintiff said he "never [has] done this well."  (Tr. at 143).

21  Many of Dr. Stone's notes from this period also describe how well Plaintiff is feeling about

22  his living situation in a boarding house with several other residents.  (Tr. at 141-A).

23      On May 25, 2005, Dr. Stone wrote in a progress note that Plaintiff was going to a day

24  center five days a week where he exercised and interacted socially with the other people

25  visiting the center. (Tr. at 141-A).  Dr. Stone's progress notes from June, July, and September,

26  2005, were all similarly positive about Plaintiff's emotional health, his living situation, and

27  his physical appearance.  (Tr. at 136-140).  The progress note from Dr. Stone in the record

28  from October 19, 2005, mentions that Plaintiff is "doing ok" and that he likes to take the bus

1    to Chinatown and home to "look at the scenery" and to "talk to a few people." (Tr. at 136).

2    By December 2005, Dr. Stone's notes begin to reflect that Plaintiff was having trouble

3    with his housing. In one note, Dr. Stone wrote that "client was told the day after [Christmas]

4    he had 24 hours to move from board & care home. He had no where to go and owner relented

5    and will assist client, although he is stressed by the uncertainty." (Tr. at 176, 185). In his

6    note from April 18, 2006, Dr. Stone indicated that Plaintiff ultimately would have to leave the

7    boarding house. (Tr. at 180, 181). The record does not include a progress note from May

8    2006. In Dr. Stone's next note, from a therapy session on June 20, 2006, he noted that

9    Plaintiff's sister Yolanda lost her house and that Plaintiff was "homeless sleeping under the

10   bridge at San Bruno & Silver." (Tr. at180). Dr. Stone wrote that Plaintiff washes at the

11   library, goes to McDonalds, and that he was still taking his medication. (Tr. at 180). Dr.

12   Stone's notes through October 24, 2006, the last note in the file, reflect that Plaintiff remained

13   homeless throughout this time and continued to live under the bridge. (Tr. at 171-180).

14   During this time, Plaintiff's sister delivered food for Plaintiff, Plaintiff slept in a sleeping bag,

15   and he bathed at church. (Tr. at 171). In the October 24, 2006, note, Dr. Stone wrote that

16   Plaintiff stated that "everything going ok. Coming along just fine." (Tr. at 171). At the end

17   of his final progress note, Dr. Stone wrote that, in his opinion, Plaintiff was doing as well as

18   could be expected. (Tr. at 171). There is no evidence in the record about why this was

19   Plaintiff's last session with Dr. Stone.

20   The record also includes a Mental Disorder Assessment form that Dr. Stone completed

21   on September 19, 2006, where he stated that Plaintiff was a paranoid schizophrenic in partial

22   remission. (Tr. at 193). Dr. Stone also noted in this report that Plaintiff was helped by the

23   Geodon prescribed by Dr. Maloof, and, until Plaintiff became homeless, that Plaintiff was

24   helped by the monthly therapy maintenance sessions with Dr. Stone.

25   In the part of the form on "functional assessment," Dr. Stone indicated that Plaintiff

26   was markedly limited in all but two areas. These marked limitations include ability to sustain

27   an ordinary routine, perform within a schedule, maintain attendance, be punctual, make simple

28   work-related decisions, perform at a consistent pace without an unreasonable  number or

9

length of rest periods, the ability to accept instructions and respond appropriately to criticism from supervisors, the ability to get along with coworkers, and the ability to tolerate the usual stresses encountered in competitive employment.  Plaintiff was moderately (as opposed to markedly) limited in the ability to understand, remember, and carry out very short and simple instructions.  There were no functions as to which Dr. Stone indicated that Plaintiff was "not significantly limited."

The material of record also includes notes from Dr. Maloof, Plaintiff's treating psychiatrist.  Plaintiff saw Dr. Maloof for the first time on February 17, 2005.  (Tr. at 151).  In notes from this initial assessment, Dr. Maloof wrote that Plaintiff complained of hearing voices and that Plaintiff frequently checked under his bed to make sure that no one was there.  (Tr. at 151).  Dr. Maloof observed that Plaintiff had flat affect, did not make eye contact, had a depressed mood, had auditory and visual hallucinations, and persecutory delusions.  (Tr. at 152).  Dr. Maloof diagnosed Plaintiff with paranoid schizophrenia and anti-social personality disorder.  (Tr. at 152).  He prescribed Geodon (Tr. at 152).

As Judge Parks noted in his opinion, Plaintiff saw Dr. Maloof regularly (Tr. at 17), and took regularly the Geodon (anti-psychotic medication) prescribed by Dr. Maloof.  The Geodon helped to relieve Plaintiff's paranoia and hallucinations, but in a note dated April 5, 2005, Dr. Maloof noted that Plaintiff still had "blunted affect" and no eye contact.  (Tr. at 146).  Dr. Maloof also made note of Plaintiff's homelessness, beginning in the summer of 2006.  (Tr. at 173).  Plaintiff's last appointment with Dr. Maloof appears to have been on October 12, 2006.  (Tr. at 172).

Judge Park's opinion noted, but gave little weight to, the opinion of consulting examining psychologist, Ahmed El Sokkary, Psy.D., who was retained by the Social Security Commission to perform a psychological examination of Plaintiff.  Dr. Sokkary completed the examination on April 11, 2005.  He diagnosed Plaintiff with  Psychotic Disorder NOS.[3]  In

---

[3]  "NOS" is a short-form for the diagnosis of "not otherwise specified," which, as applied in this context, is for a category of psychotic disorders that include psychotic symptomatology (i.e., delusions, hallucinations, disorganized speech, grossly disorganized or catatonic behavior) about which there is inadequate information to make a specific diagnosis or about which there is contradictory information,

his report, Dr. Sokkary wrote that Plaintiff was "guarded and internally preoccupied," and that he "revealed anxious affect with underlying depressed mood." (Tr. at 110). With respect to Plaintiff's ability to work, Dr. Sokkary wrote that Plaintiff was able to complete very simple tasks in a supportive environment with direct supervision but that Plaintiff "struggled throughout the evaluation and would have difficulty in maintaining a fair level of concentration, persistence, and pace to work in an environment that his health condition would allow." (Tr. at 111). Notably, Dr. Sokkary also included that Plaintiff "was unable to relate in the interview and would be unable to appropriately interact with supervisors and co-workers in a job setting at this time." (Tr. at 111).

The record also contains a report from Dr. Ida Hilliard, M.D., a State agency examiner, dated June 6, 2005. (Tr. at 113). Dr. Hilliard appears to have reviewed Plaintiff's file, but not to have examined Plaintiff. In her Mental Residual Functional Capacity Assessment, Dr. Hilliard noted Dr. Sokkary's diagnosis of Psychotic Disorder, NOS. (Tr. at 117). Dr. Hilliard also noted that Plaintiff was diagnosed with anxiety disorder, NOS. (Tr. at 118). Dr. Hilliard opined with regard to Plaintiff's mental RFC that Plaintiff would be "moderately limited" in understanding and remembering detailed instructions, carrying out detailed instructions, and maintaining attention and concentration for extended periods. (Tr. at 113). Dr. Hilliard believed that Plaintiff would not be significantly limited in any other areas.

Also in the record are notes from treatment Plaintiff received, beginning in March, 2005, at San Francisco General Hospital through the community health network. These notes indicate that Plaintiff was diagnosed with schizophrenia and was taking Geodon. (Tr. at 127). The notes also mention that Plaintiff had a history of suicide attempts for which he had been hospitalized. (Tr. at 127).

The record before the ALJ also contained evidence from Dr. Jaskaran Momi, M.D., who performed a consultative *physical* examination of Plaintiff on April 7, 2005. Dr. Momi

---

or disorders with psychotic symptoms that do not meet the criteria for any specific Psychotic Disorder. *See* American Psychiatric Association Diagnostic and Statistical Manual of Mental Disorders 4th Ed., Section 298.9 (2000).

11

1    wrote that Plaintiff reported symptoms of paranoid schizophrenia beginning in 2005, that

2    Plaintiff had a history of substance abuse and dependence, but had been clean and sober since

3    approximately 1999.  In the section of his report entitled "Impressions," Dr. Momi wrote that

4    Plaintiff had "(1) a history of dog bite with normal exam; (2) History of hepatitis C, positive

5    status found on routine labs, no symptoms, no information on liver function test; (3) History

6    of schizophrenia, cocaine abuse, heroin abuse in the past, he is scheduled to see a psychiatrist

7    on April 11, 2005; and (4) history of repeated incarcerations and no work history."  (Tr. at

8    107).  From a physical standpoint, Dr. Momi concluded that Plaintiff had no limitations on

9    sitting, standing, walking, lifting, carrying, bending, stooping, reaching, handling, fingering,

10   gripping or feeling.  (Tr. at 107).  Dr. Momi stated that Plaintiff had no physical workplace

11   or environment limitations.  (Tr. at 107).

12   Judge Parks relied very heavily upon the testimony of medical expert Dr. David

13   Anderson, M.D., who appeared by telephone at Plaintiff's December 2006 hearing.  Dr.

14   Anderson never met or examined Plaintiff.  Based entirely on his review of records, and

15   without ever laying eyes on Plaintiff, Dr. Anderson testified that Plaintiff had two mental

16   impairments:  a personality disorder and a social phobia.  (Tr. at 232).

17   At the hearing, Dr. Anderson testified that he disagreed with the diagnosis by Dr. Stone

18   that Plaintiff suffered from paranoid schizophrenia.  That diagnosis, according to Dr.

19   Anderson, could not be squared with the progress Plaintiff made after he began taking

20   Geodon.  Moreover, Dr. Anderson pointed out that there was no documentation of mental

21   illness in Plaintiff's correctional system records.  After making this observation, however, Dr.

22   Anderson proceeded to acknowledge that "the mental health system in the Department of

23   Correction for the State of California is anything but model.  It's rather poor, so he could

24   easily slip through the cracks."  (Tr. at 234).

25   Dr. Anderson also noted that Dr. Stone changed Plaintiff's diagnosis from  DSM

26   number 295.3, for paranoid schizophrenia, to DSM numbers 300.3 and 300.29, both of which

27   Dr. Anderson testified were social phobia diagnoses.  Dr. Anderson was incorrect about the

28   diagnoses.  In his early February 2005, progress note, Dr. Stone did change Plaintiff's

1  diagnoses to these particular DSM numbers but *neither* number is for a social phobia.

2  Diagnosis 300.3 is for Obsessive-Compulsive Disorder.  Diagnosis 300.29 is for Specific

3  Phobia, which is characterized by the "marked and persistent fear of clearly discernible,

4  circumscribed objects or situations."  *See* American Psychiatric Association Diagnostic and

5  Statistical Manual of Mental Disorders 4th Ed., Sections 300.3 and 300.29 (2000).  Despite

6  the error, which we assume remained unknown to Judge Parks, Judge Parks accepted

7  wholesale Dr. Anderson's testimony and made a finding that Plaintiff suffered from a severe

8  social phobia.

9      Dr. Anderson also disagreed with the conclusions of consulting *examining*

10  psychologist, Dr. Sokkary.  Dr. Anderson testified that Dr. Sokkary's report of April 11, 2005,

11  showing a markedly dysfunctional mental status examination, was inconsistent with the

12  progress note by Dr. Stone on April 5, 2005, which said that Plaintiff was doing better.  (Tr.

13  at 143).  The April 5, 2005, note quoted Plaintiff, in part, as saying that he "never [has] done

14  this well," and that he was "at ease & a little happy."  (Tr. at 143).   Given this apparent

15  inconsistency, Dr. Anderson testified that he believed Plaintiff may have been exaggerating

16  his symptoms when he was seen by Dr. Sokkary.

17      Even though Dr. Anderson disagreed with the particular diagnostic conclusions of Drs.

18  Stone and Sokkary,  he testified that, "I still think [Plaintiff] has a disorder,"  and "I have to

19  evaluate what are the individual symptoms and how severe they are."  (Tr. at 235).  Dr.

20  Anderson concluded that there was a "significant residual symptomatology," and that given

21  Plaintiff's long history of incarceration, his moderate restrictions in social functioning, and his

22  moderate impairment in sustained concentration, persistence, and pace, "I can't imagine that

23  this man would ever be able to have substantial gainful employment . . . in any kind of

24  ongoing regular way." (Tr. at 236).

25      Prompted by questions from Judge Parks, Dr. Anderson further testified that "tak[ing]

26  it from the place when [Plaintiff] had housing . . .  he was able to attend to his [personal

27  hygiene] very well . . . and he attended his [therapy] appointments very well. Social

28  functioning though is where I think a residual is very strong and with medicines it's moderate.

13

1    I think his capacity to pay attention and concentrate — mostly because of his inability to be

2    around people in any kind of ongoing sustained way . . . was moderately disturbed." (Tr. at

3    237-38).  Dr. Anderson ended his testimony by stating that he thinks Plaintiff's treatment

4    could be more innovative and possibly other medications could be prescribed that were less

5    sedating.  (Tr. at 238).

6         Next, Judge Parks relied upon the testimony of a vocational expert, Joel Greenberg.

7    The vocational expert's testimony consisted primarily of answers to questions from the ALJ

8    about the various jobs that would be available to a hypothetical claimant with a particular

9    RFC.  In the first hypothetical, the ALJ asked the vocational expert to consider an RFC  that

10   included mild restrictions for activities of daily living with little or no impairment;  moderate

11   restrictions for social functioning with some difficulty with coworkers and the general public;

12   mild restrictions for concentration, persistence, and pace; and difficulties in the range of 40

13   to 50 percent as to detailed and complex tasks but little difficulty doing simple and repetitive

14   tasks limited to one and two steps (because of educational limitations in the ability to read and

15   to write); and no episodes of decompensation at the medium exertional level.  (Tr. at 241).

16    After hearing this hypothetical, the vocational expert opined that there were jobs existing in

17   significant numbers in the national economy that Plaintiff could perform, including that of

18   janitor, landscaper, and autodetailer.

19         In the second hypothetical, the ALJ  kept all of the facts of the first hypothetical the

20   same, except that he asked the vocational expert to consider a category of "light," as opposed

21   to medium, work.   To this, the vocational expert answered that he would include "bottling

22   line attendant," as a possible job for Plaintiff.  (Tr. at 243).

23         In the third hypothetical, the ALJ changed the facts as they related to the theoretical

24   claimant's concentration, persistence, and pace.  In the first hypothetical, the vocational expert

25   had been asked to assume that the limitation in this area was only mild; in this third

26   hypothetical, however, the ALJ asked the vocational expert to assume that the limitation

27   would be *moderate* for concentration, persistence, and pace with difficulties in the 40 to 50

28   percent range for detailed and complex tasks, *as well as* difficulties in the 40 to 50 percent

14

range for simple repetitive tasks. (Tr. at 244). In answering whether under this hypothetical there would be any job in the national or regional economy the person could perform, the vocational expert stated that "[n]o, your Honor, the moderate impairment on pace, concentration and persistence would preclude them."[4] (Tr. at 244).

Finally, the ALJ considered, but declined in significant measure to credit, the testimony given by Plaintiff. Plaintiff testified that he is paranoid being around people that he doesn't know, and that he likes to be by himself. Plaintiff stated that he has experienced this fear and paranoia since the 1980's, and that before he started taking his medication he would hear voices. He testified that his medication keeps him calm but that the medications are strong and, as a consequence, he "doze[s] off and it's hard for [him] to focus." (Tr. at 217). Plaintiff stated that he had never been hospitalized for paranoia or schizophrenia.

Plaintiff testified that he attended school up until the ninth grade but that he is unable to read and can only write his name. Plaintiff stated that from elementary school thereafter he was placed in special classes. He did not attend regular education classes. With respect to his work experience, Plaintiff said that he worked as a home health aide for his nephew for about eight months, during which he stayed and watched over his nephew, rode with him to see a nurse at a clinic, and made emergency phone calls when necessary. Plaintiff did not undertake any other tasks with respect to his nephew's care. Other than his sister, Plaintiff testified that he did not have any friends. (Tr. at 227).

Plaintiff testified that he was incarcerated for "stealing" for a total of "26 or 23" years (Tr. at 220), in total, pursuant to several different sentences. Plaintiff says that he did not take any medication while he was in prison. Plaintiff has been out of prison since 2000 and is on parole. Plaintiff used heroine and cocaine in the past but testified that he has been sober since 2000. Plaintiff also testified that he has hepatitis C, and that he has throbbing leg pain in his left leg resulting from a police dog bite in the 1980's.

---

[4]    At the end of the vocational expert's testimony, Plaintiff's attorney noted that the third hypothetical reflected Dr. Anderson's testimony about Plaintiff's RFC, as well as evidence from Dr. Stone.

With respect to his daily activities, Plaintiff testified that he is homeless and sleeps under "the bridge." (Tr. at 223).  He has been living under the bridge since his "board and care" house was closed.  He wakes up at 6:00 a.m., brushes his teeth, eats something, takes his medicine, and then goes to the library.  He stated that his sister visits him and that people from his former transitional house bring him food and wash his clothing.  Plaintiff said that he sleeps under the bridge because he is scared to go to shelters, where he does not like the environment because in includes too much drinking and people engaging in crazy behavior.

When asked by Judge Parks what kind of problems he would have if he was asked to work as a home health aide again for a relative, Plaintiff testified that it would be "hard to focus," and that his medicine would cause him to "doze off." (Tr. at 225).

After Judge Parks concluded his series of questions to Plaintiff at the hearing, Dr. Anderson, the medical expert, asked Plaintiff a series of questions.  During this line of questioning, Plaintiff testified that it was "automatic" that he was seen by a psychologist (or psychiatrist, Plaintiff did not specify) in prison.  He also said that he had requested to see a psychologist in prison for his paranoia and because "his head was tripping." (Tr. at 230).  Plaintiff did not remember clearly, but did not believe he received any treatment for his symptoms after seeing the psychologist.  Plaintiff stated that he was in maximum security prison with violent offenders where most of the time they were "locked down." (Tr. at 230).  Plaintiff said that because of the near-constant lock down, there was not much time for the inmates to do work, but that occasionally they were trained to do janitorial duties.  When asked about his fear and his medication, Plaintiff stated that since he has been on the medicine he is at ease and no longer has the fears he used to have, but that when he sits down he falls asleep. (Tr. at 231).  His psychiatrist reduced his dosage from three pills a day to two pills a day after Plaintiff reported the severity of this side effect.

The Judge found that Plaintiff's descriptions of the severity and intensity of his symptoms were not credible.  Judge Parks noted that Plaintiff alleged that he has been disabled since 2004 but did not provide any treatment records covering that period.  The ALJ also pointed out that Plaintiff at another time stated that his paranoid symptoms began in

2005.  Judge Parks also seemed to think that it was significant that despite complaining about being paranoid in January 2005, Plaintiff did not seek treatment until February 2005 — one month later.   Judge Parks went on to state that Plaintiff's paranoia appears to have been related to his experiences during many years of incarceration and that when he began to take psychotropic medication and attend counseling sessions, Plaintiff made remarkable improvement.  When he was in a stable living environment he was doing well , getting along with the people in his board and care house.   Judge Parks then noted that Plaintiff's "symptoms became less positive" when he became homeless in 2006 (Tr. ta 19).  In sum, the ALJ concluded in the "Findings" section of his Opinion that "[c]laimant's allegations on the severity and intensity of his symptoms are not credible for the period [prior] to September 19, 2006." (Tr. at 21).

### C.    REVIEW OF THE ALJ'S DECISION

Plaintiff raises two issues for review:   (1) whether the ALJ improperly credited the opinion of medical expert Dr. David Anderson, M.D., and largely rejected the medical opinions of treating psychologist Dr. Stone, Ph.D., treating psychiatrist, Dr. Maloof, M.D., and consulting examining psychologist, Dr. Sokkary, Ph.D., to find that Plaintiff was entitled to disability benefits beginning only as of September 19, 2006, as opposed to the date of Plaintiff's application — January 12, 2005; (2) whether the ALJ improperly discredited Plaintiff's report of his symptoms.

1.    *The ALJ Did Not Provide Specific, Legitimate Reasons Supported by Substantial Evidence for Rejecting the Opinions of Drs. Stone, Maloof, and El Sokkary*

Plaintiff seeks review of the ALJ's rejection of the opinion of his two treating doctors — Drs. Stone and Maloof — and of consulting examining psychologist Dr. El Sokkary, in favor of the opinion of Dr. David Anderson, a medical expert who appeared on the phone during Plaintiff's hearing, but who never met or examined Plaintiff.  In particular, Plaintiff claims that evidence from Drs. Stone, Maloof, and El Sokkary support a finding that the level of mental impairment and the RFC that were incorporated in  the ALJ's third hypothetical to

17

1   the vocational expert were present well before September 19, 2006 — the date Judge Parks
2   determined Plaintiff first became eligible to receive benefits.

3       There are several problems with the reasoning in the ALJ's opinion that require us to
4   REVERSE the decision and to REMAND this matter so that Judge Parks can reassess the
5   evidence of record in a manner that is consistent with this Order.

6       First, at the most basic level, even under Judge Parks' finding that Plaintiff was eligible
7   for benefits only when he became homeless, Judge Parks did not explain why he chose
8   September 19, 2006, as that date even though the evidence in the record appears to establish
9   that Plaintiff became homeless in June 2006.

10      Second, Judge Parks did not properly identify any arguably sufficient support for his
11  decision to reject the opinions of the treating and examining doctors – opinions under which
12  it would appear that Plaintiff suffered from a level of mental/emotional impairment that would
13  result in a disabling RFC long before September 19, 2006.

14      The Ninth Circuit recently reaffirmed that, in an SSI case, "[t]he opinion of an
15  examining doctor, even if contradicted by another doctor, can only be rejected for specific and
16  legitimate reasons that are supported by substantial evidence in the record." *Widmark v.*
17  *Barnhart*, 454 F.3d 1063, 1066 (9th Cir. 2006) (quoting *Lester v. Chater*, 81 F.3d 821, 830-
18  31 (9th Cir. 1995)).  The rule is even more stringent for a *treating* doctor.  *See e.g.,*
19  *Magallanes v. Bowen*,  881 F.2d 747, 751 (1989); *see also*, *Orn v. Astrue*, 495 F.3d 625,
20  631-32 (9th Cir. 2007) (a treating physician's opinion must be given controlling weight if it
21  is well-supported and not inconsistent with the other substantial evidence in the record).
22  Moreover, "[t]he opinion of a nonexamining physician cannot by itself constitute substantial
23  evidence that justifies the rejection of the opinion of either an examining physician or a
24  treating physician." *Id*. at n. 2 (quoting *Lester*, 81 F.3d at 831).

25      The ALJ did not follow this settled law.  Instead, in arriving at the conclusion that
26  Plaintiff suffered from social phobia and a personality disorder, and that he did not suffer from
27  a psychotic disorder or paranoid schizophrenia, the ALJ rejected the reports and assessments
28  of several treating and examining experts.  Dr. Stone, a psychologist who *treated* Plaintiff for

18

almost two years, diagnosed Plaintiff at the outset as having paranoid schizophrenia. Dr. Stone later revised his diagnosis to obsessive compulsive disorder and specific phobia, but even this modified assessment appears to be irreconcilable with the ALJ's finding. Dr. Maloof, a psychiatrist who *treated* Plaintiff for almost two years, diagnosed Plaintiff with paranoid schizophrenia. Dr. El Sokkary, the consultant retained by the Commission, *examined* Plaintiff and diagnosed him with psychotic disorder NOS. And Dr. Hilliard, who was retained by the Commission to review the medical evidence, acknowledged that Plaintiff had been diagnosed with psychotic disorder NOS.

Judge Parks did not identify substantial evidence or set forth clearly any medical reasoning that would support rejecting these doctors' diagnoses — all relatively consistent with one another — in favor of the views of Dr. Anderson, who had never examined or met Plaintiff. Moreover, Dr. Anderson's opinion suffered from at least one significant internal infirmity. He based his testimony in large part on a disagreement with Dr. Stone's September 19, 2006, report. In particular, Dr. Anderson criticized the report on the ground that it contained a diagnosis of "paranoid schizophrenia in partial remission" for Plaintiff, which did not reflect, in Dr. Anderson's opinion, Dr. Stone's revised diagnosis on February 16, 2005, where he wrote that "diagnoses changed to axis I:  300.3 . . . axis I: 300.29." (Tr. at 150). According to Dr. Anderson, both of these DSM diagnoses —  300.3 and 300.29 — were diagnoses for "social phobia." (Tr. at 232).  As it turns out, however, *neither* diagnosis is for a social phobia. DSM number 300.3 is for obsessive compulsive disorder, and DSM number 300.29 is for specific phobia.

In addition, neither Judge Parks nor Dr. Anderson seems to have made any effort to determine whether Dr. Stone's reference to "paranoid schizophrenia in partial remission" was not simply a mistake but, instead, a second change in assessment based in part on having seen Plaintiff for an additional year. It is clear from the fact that he noted "in partial remission" that Dr. Stone  did not merely copy notes from his original assessment of Plaintiff.  Rather, he seems to have assessed Plaintiff's condition anew when he wrote this last report — after

19

1  treating Plaintiff and observing his improvement on anti-psychotic medication for an
2  additional year and a half.

3      Moreover, Judge Parks never provided any reason for ignoring the diagnosis of
4  paranoid schizophrenia by Dr. Maloof, Plaintiff's treating psychiatrist.  There is no evidence
5  that Dr. Maloof ever changed this diagnosis to obsessive compulsive disorder, specific phobia,
6  or anything else.  Similarly, Judge Parks did not explain why he disregarded Dr. El Sokkary's
7  diagnoses of psychotic disorder NOS — a diagnosis that was based in part on an examination
8  of Plaintiff, and that is entirely consistent with a diagnosis of paranoid schizophrenia.  Both
9  disorders are located in the DSM chapter on "Schizophrenia and other Psychotic Disorders."
10  *See* American Psychiatric Association Diagnostic and Statistical Manual of Mental Disorders
11  4th Ed., Section pp. 297-343 (2000).

12      It also is significant that Dr. Anderson concluded that Plaintiff exhibited "significant
13  residual symptomatology."  (Tr. at 236).  Judge Parks did not explain how his findings could
14  be squared with Dr. Anderson's concession that Plaintiff exhibited symptoms characteristic
15  of a significant mental impairment.

16      With respect to Plaintiff's ability to work, Dr. Anderson did not agree with Dr. Stone's
17  assessment that Plaintiff was markedly limited in most areas of function.  Because Plaintiff
18  had improved substantially on Geodon, his anti-psychotic medication, had stopped having
19  hallucinations, and told Dr. Stone that he was feeling better and more calm, Dr. Anderson
20  believed that Dr. Stone had overreached in his report by concluding that Plaintiff was so
21  markedly limited.

22      But neither Dr. Anderson nor Judge Parks addressed the <u>relative</u> nature of the
23  references in Dr. Stone's progress notes.  There is nothing necessarily inconsistent between
24  observing that Plaintiff *had* made great improvement after taking his medication, but
25  nonetheless remained subject to marked (or at least moderate) limitation in many important
26  areas of function.  In an April 5, 2005, progress note, for example, despite Plaintiff having
27  been on  medication for several months, Dr. Maloof still recorded that Plaintiff had "blunted
28  affect" and no eye contact.  (Tr. at 146).  Similarly, in Dr. El Sokkary's report from his

1   examination of Plaintiff on April 11, 2005, Dr. El Sokkary wrote that Plaintiff was "guarded
2   and internally preoccupied," "revealed anxious affect with underlying depressed mood," and
3   had an "underproductive thought process." (Tr. at 110).   This report also was done while
4   Plaintiff was on medication.  Notably, even during the time when Plaintiff was homeless *after*
5   September 19, 2006, when the ALJ agreed that Plaintiff was entitled to  benefits, Dr. Stone's
6   progress note (from October 24, 2006) indicated that Plaintiff had said that "everything going
7   ok.  Coming along just fine." (Tr. at 171).   Dr. Stone ended the October 2006 progress note
8   by saying that Plaintiff was doing as well as could be expected. (Tr. at 171).  Evidence that
9   Plaintiff was doing better when he was on medication says little about his ability to maintain
10  regular employment.   In any case, as we explain in the section that follows, though Dr.
11  Anderson did not agree that Plaintiff was *markedly* limited, he did believe that Plaintiff was
12  *moderately* limited in very important areas, and that it would be very difficult for Plaintiff to
13  work.

14      The third, and perhaps most important, error that we found in Judge Parks' opinion is
15  that, while he accepted Dr. Anderson's erroneous testimony that Plaintiff had a social phobia,
16  the ALJ did <u>not</u> accept Dr. Anderson's testimony that he could not "imagine that this man
17  would ever be able to have substantial gainful employment . . . in any kind of ongoing regular
18  way" — even when he had a stable living situation.  (Tr. at 236).    After hearing Dr.
19  Anderson's testimony, especially his conclusion that Plaintiff had **moderate** restrictions on
20  concentration, persistence, and pace, it is unclear why Judge Parks then posed to the
21  vocational expert the first hypothetical in which the claimant had only *mild* restrictions on
22  concentration, persistence, and pace.  Indeed, there is not a single piece of evidence in the
23  record from any of the doctors — treating, consulting, or otherwise — to indicate that Plaintiff
24  was only *mildly* limited in the important areas of concentration, persistence and pace.

25      Moreover,  because this error was critical to Judge Parks' conclusion about when
26  Plaintiff's right to receive SSI benefits accrued, it cannot be characterized as "harmless."  *See*
27  *e.g.,  Stout v. Commissioner*, 454 F.3d 1050 (9th Cir. 2006) (prejudicial errors are not
28  harmless).

21

Indeed, there is little doubt about what the vocational expert's answer would have been to a question posed by the ALJ that accurately incorporated an RFC based on Dr. Anderson's testimony.  As Plaintiff's attorney pointed out, the third hypothetical posed to the vocational expert — the one that resulted in the expert saying that there were no jobs in the economy for a claimant with such an RFC— incorporated the very restrictions that Dr. Anderson testified would apply to Plaintiff (that is, moderate restrictions on concentration, persistence, and pace).  Obviously, this vocational expert would have testified that no jobs were available to a claimant who was *markedly limited* in concentration, persistence, and pace, which was the mental RFC provided by Plaintiff's treating psychologist, Dr. Stone.

Under controlling Ninth Circuit precedents, the ALJ was required to set forth "clear and convincing" reasons for rejecting the diagnoses and the opinions about Plaintiff's functional limitations by Drs. Stone and Maloof — Plaintiff's *treating* psychologist and psychiatrist, respectively.  *See Magallanes*, 881 F.2d at 751.  Judge Parks also was required to articulate "specific and legitimate reasons" for rejecting or ignoring the diagnoses and the opinions about functional limitations by consulting *examining* Doctor El Sokkary.  *See e.g., Widmark*, 454 F.3d at 1066-67.  By failing to satisfy these requirements, the ALJ committed legal error.

The ALJ also committed legal error by failing to provide any reason for choosing September 19, 2006, as the legally appropriate date for Plaintiff to begin receiving benefits.  While Judge Parks apparently felt that Plaintiff's entitlement did not mature until he became homeless, the evidence in the record fixes that date in June of 2006, not in September of that year.  Finally, the ALJ committed legal error by ignoring the testimony of his own medical expert, Dr. David Anderson, that Plaintiff, even before he became homeless, was moderately limited with respect to concentration, persistence, and pace, and would have significant difficulty retaining employment

For all of these reasons, we must remand this action to the ALJ to reconsider the evidence in a manner consistent with this Order, and to re-assess under step five whether the Commission met its burden to prove that Plaintiff was capable of working in jobs that existed

in significant numbers in the national economy from January 12, 2005, when he filed his Application, through September 19, 2006.

> 2.     *The ALJ Committed Legal Error by discrediting, without sufficient articulated cause, Plaintiff's Report of his Symptoms*

Plaintiff also seeks review of the ALJ's finding that "[c]laimant's allegations on the severity and intensity of his symptoms are not credible for the period [prior] to September 19, 2006." (Tr. at 21).

In general, and within certain boundaries, credibility determinations are the province of the ALJ.  "It is the ALJ's role to resolve evidentiary conflicts.  If there is more than one rational interpretation of the evidence, the ALJ's conclusion must be upheld."  *Allen v. Secretary of Health and Human Services*, 726 F.2 1470, 1473 (9th Cir. 1984), citing *Richardson v. Perales*, 402 U.S. 389, 399 (1971); *Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982).  Subject to some legal conditions, an ALJ has discretion not to accept a plaintiff's testimony about her subjective condition.  To justify discrediting the subjective evidence, however, the ALJ must articulate reasons or facts that are "sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony." *See Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002).

The ALJ may consider at least the following factors when weighing the claimant's credibility:  reputation for truthfulness; inconsistencies either in the claimant's testimony or between testimony and conduct; daily activities; work record; and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which the claimant complains.  *Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (1997).

In this case, in addition to other less relevant evidence, Plaintiff presented subjective testimony that he has suffered from paranoia since the 1980's, that his fears have been eased by his anti-psychotic medication,  that his medication makes him very tired, and that he feels work would be difficult because he would doze off and would find it difficult to focus.  (Tr. at 214-231).

23

Judge Parks stated that while Plaintiff alleged that he had been disabled since 2004 he failed to provide treatment records covering that period. The ALJ also noted that Plaintiff at another time stated that his paranoid symptoms began in 2005. In addition, Judge Parks pointed out that despite complaining about being paranoid in January 2005, Plaintiff did not seek treatment until February 2005 — one month later. None of these reasons are legally sufficient to discredit Plaintiff's testimony.

Plaintiff consistently stated throughout the record that his paranoia and fears began in the 1980's. That there is one reference in the report of Dr. Momi, the consultative *physical* examining doctor, that Plaintiff's symptoms of schizophrenia began in 2005 does not sufficiently undermine Plaintiff's credibility. It is just as likely that Dr. Momi made an error, or, more likely, that Plaintiff said 2005 because that is when he was actually diagnosed with schizophrenia by Drs. Stone and Maloof. Moreover, Judge Parks provides no rational basis for discrediting Plaintiff's testimony based upon a one-month lag in seeking treatment.

Judge Parks went on to state that Plaintiff's paranoia appears related to his experience during many years of incarceration. Again, Judge Parks failed to explain how this comment undermines Plaintiff's credibility. If Judge Parks intended to imply that a diagnosis of schizophrenia or psychotic disorder NOS would be unlikely in a situation where a person's fears developed in reaction to their environment, he provides no medical basis for such an opinion. Moreover, if a medical basis for such an opinion did exist, it would say nothing about *Plaintiff*'s credibility. Plaintiff stated consistently only that he had fears, paranoia and hallucinations. Plaintiff's treating and examining doctors, not Plaintiff, made the specific diagnoses of schizophrenia and psychotic disorder NOS.

Nor do we understand how Plaintiff's credibility was tainted, as Judge Parks seems to suggest, by the fact that Plaintiff's condition improved when he took anti-psychotic medication and was in a stable living environment. Plaintiff did not deny that his condition improved when he took the medication and had a stable living environment. Instead, he testified that when he took the medication he no longer suffered from hallucinations and no

longer felt paralyzed by paranoia.  Why does such testimony, clearly against interest, undermine his credibility?  Judge Parks does not explain.  Surely the fact that Plaintiff testified that the medication made him drowsy and thus compromised his ability to sustain concentration could not be a basis for concluding that Plaintiff was lying — as there was no evidence from a competent medical expert to suggest that the medication would not likely cause such side effects.

After careful consideration of all the pertinent evidence, we conclude that the reasons Judge Parks articulated, directly and by intimation, for discrediting Plaintiff's testimony were, as a matter of law, insufficient.  We cannot conclude that there is a rational basis in the evidentiary record for Judge Parks' conclusion that Plaintiff's testimonial account of his symptoms was not credible.

Plaintiff's testimony about his incarceration, his fears, and that he was unable to work because his medication made him tired and unable to focus is entirely consistent with the medical evidence in the record (discussed at length above) from Drs. Stone, Maloof, El Sokkary, and even the ALJ's medical expert, Dr. Anderson, who perhaps stated it most clearly when he said that even during the time Plaintiff had a stable living situation, there was a "significant residual symptomatology," and that given his long history of incarceration, his moderate restrictions in social functioning, and his moderate impairment in sustained concentration, persistence, and pace, "I can't imagine that this man would ever be able to have substantial gainful employment . . . in any kind of ongoing regular way." (Tr. at 236).

In sum, we conclude that the ALJ's decision to discredit Plaintiff's testimony was not supported by substantial evidence in the record.  On remand, the ALJ must take fully into account, under appropriate legal standards, Plaintiff's subjective testimony about his symptoms and their date of onset.

///
///

CONCLUSION

The record we have reviewed compels us to conclude that the ALJ made significant legal errors in rejecting the opinions of Drs. Stone, Maloof, and El Sokkary; in relying on erroneous testimony by Dr. Anderson to find that Plaintiff had a social phobia; in presenting and relying upon a hypothetical to the vocational expert that was not supported by the evidence; and in arbitrarily deciding to award Plaintiff benefits beginning in September 2006, rather than the date Plaintiff applied. The ALJ also erred by discrediting Plaintiff's testimony. Thus, the ALJ's determination that Plaintiff was ineligible for SSI benefits prior to September 19, 2006, is not supported by substantial evidence. For all of the foregoing reasons, the court DENIES defendant's cross-motion for summary judgment and GRANTS, in part, Plaintiff's request for relief by VACATING the Commissioner's decision and REMANDING the action to the Commissioner for further administrative proceedings consistent with this Order.

IT IS SO ORDERED.

Dated: July 25 , 2008

_____
WAYNE D. BRAZIL
United States Magistrate Judge